IN THE MATTER OF JAMES F. NORTON AN
ATTORNEY AT LAW.

November 10, 1988.

## ORDER

The Disciplinary Review Board having filed a report with the Supreme Court recommending that the suspension from the practice of law since June 3, 1981, of JAMES F. NORTON of TINTON FALLS and MIDDLETOWN, who was admitted to the Bar of this State in 1959, be deemed sufficient discipline for his violations of *DR* 6–101(a)(2) and *DR* 9–102;

And the Office of Attorney Ethics and respondent, through counsel, having concurred in the Disciplinary Review Board's recommendation;

And the Court having carefully considered the record, and good cause appearing;

It is ORDERED that the findings of the Disciplinary Review Board are hereby adopted; and it is further

ORDERED that the Decision and Recommendation of the Disciplinary Review Board, together with this order and the full record of the matter, be added as a permanent part of the file of said JAMES F. NORTON as an attorney at law of the State of New Jersey; and it is further

ORDERED that respondent is now eligible to make application for restoration to the practice of law pursuant to *Rule* 1:20–11(h); and it is further

ORDERED that respondent shall continue to comply with the regulations governing suspended attorneys pending Supreme Court action on an appropriate restoration request, and it is further

ORDERED that JAMES F. NORTON reimburse the Ethics Financial Committee for appropriate administrative costs.

## APPENDIX

*Decision and Recommendation of the*
*Disciplinary Review Board*

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

This matter is before the Board based on two Presentments filed by the District IX (Monmouth County) Ethics Committee. Heard concurrently were two recommendations for Private Reprimand also filed by the Committee.

Respondent had consented to a Temporary Suspension from the practice of law on June 3, 1981, and remains suspended at this time.

The facts of each matter follow.

*The Marks Matter*

Through the recommendation of another attorney, Helen Marks conferred with respondent in connection with a medical

malpractice case which she proposed to bring against an area hospital and two physicians who had treated her. Some months later, around October 11, 1976, Marks retained respondent to handle the case. Respondent filed suit shortly thereafter.

Interrogatories were then served upon respondent by the respective attorneys for the doctors and the hospital. Respondent forwarded the interrogatories to Marks, who attempted to answer them and returned them to respondent. However, respondent never formally answered the interrogatories.

Respondent eventually received a report which showed there was possible malpractice on the part of one or both of the physicians, but none on the part of the hospital. He therefore consented to the dismissal of the case against the hospital. However, the case against the physicians had already been dismissed due to respondent's failure to answer their interrogatories. The dismissal apparently occurred in November 1977, although respondent testified at the Ethics Committee hearing that he was not aware of the dismissal at that time, but only learned of it a year later.

Despite repeated communications from his client, respondent ignored the problem and did not inform her that her suit had been dismissed as to all three defendants.[1]

After a hearing held on November 21, 1980, a panel of the District IX Ethics Committee found that respondent was guilty of gross negligence, misrepresentation to his client, and failure to carry out a contract of employment.

*The Napoliello Matter*

In October 1976, Donald and Maria Yuhasz purchased a home in Holmdel, taking out a mortgage in the amount of $63,000. When they were unable to keep up the payments on the mortgage, Mrs. Yuhasz' parents, Louis and Ruth Napoliello,

---

[1]The record is unclear as to whether Mrs. Marks' medical malpractice action was foreclosed; at the time of the hearing, respondent acknowledged that a legal malpractice action remained viable.

sought permission to assume the mortgage, and when they were denied this, made an agreement with their daughter and son-in-law to buy the latter's home from them. To do this, the Napoliellos obtained a mortgage of $25,000 from the same bank.

Ultimately, the Napoliellos gave respondent a total of approximately $61,500, to be deposited in respondent's trust account and used for the purchase of the property. A closing was held in September 1978, but several months later the bank still had not been paid or the earlier mortgage cancelled. Respondent finally forwarded his trust account check to the bank in early January 1979, but additional sums were still needed, which respondent finally paid out of his own pocket. Eventually, after the Napoliellos had hired new counsel, the matter was settled, the earlier mortgage cancelled, and the new deed recorded.

At the same hearing of November 21, 1980 at which the Marks matter was presented, the District IX Ethics Committee panel found that respondent had failed to carry out a contract of employment and failed to deliver funds promptly, and determined that he was guilty of gross negligence and a pattern of negligence. The Committee therefore recommended a Presentment for the two cases be combined.

*The Garvey Matter*

In late December 1975 James Garvey suffered a broken leg during an altercation with a Michael Kovic in the Borough of Highlands. He retained respondent to bring a personal injury action against Kovic. Respondent filed suit against Kovic in February 1976. Interrogatories were duly served upon respondent by Kovic's lawyer, but respondent failed to answer them. As a result, the suit was dismissed in March 1978. Respondent made a motion to restore the matter in 1980 by way of a consent order, but again did not follow through with the matter. Garvey's cause of action was barred by the Statute of Limitations.

A panel of the District IX Ethics Committee heard the matter on December 7, 1981. The Panel found respondent guilty of failing to act competently and failing to represent a client zealously, and recommended a Presentment.

## The Albanese Matter

At the request of respondent, Joseph Albanese, Jr., a certified shorthand reporter in Toms River, took the deposition of a physician in May 1979 and prepared transcripts for respondent and his adversary. At the same time, Albanese billed respondent for his services. The bill was not paid, and various duplicate bills were sent to respondent over a period of almost two years. Finally, complainant filed suit in Monmouth County District Court Small Claims Division. Just before the suit was to be heard, complainant called respondent's office and on June 26, 1981 complainant finally received a check for $196.40. He deposited the check in his business account, only to be notified by his bank several weeks later that the check had been dishonored. Complainant notified respondent's office. Several weeks later he again attempted to deposit the check, but again it was returned for insufficient funds.

After a hearing on December 7, 1981, a panel of the District IX Ethics Committee found that respondent's failure to pay complainant's bill and the circumstances under which the bill was unpaid constituted a breach of an attorney's ethical responsibilities. The panel recommended a Private Reprimand.

## The Gillis Matter

In May 1977 respondent filed a personal injury suit on behalf of a client named Eileen Gillis. Gillis and her husband had difficulty contacting respondent, and were about to change attorneys when respondent notified them in June 1980 that he had received a settlement offer of $7,500, from which they would net $6,000 after deduction of respondent's fee. Gillis accepted the settlement and endorsed the settlement check on or about August 5, 1980. Despite repeated telephone calls over the next two months, Gillis did not receive her share of the

settlement proceeds. On October 6, 1980 Gillis went to respondent's office and was given a check for $6,000, but the check was rejected for insufficient funds. Gillis notified respondent, who advised that a deposit had been made and that she should again try to cash the check. She did so, and was then able to obtain payment. However, she complained to the Ethics Committee.

The Director of Ethics and Professional Services brought a motion for temporary suspension of respondent, which motion was heard before the Disciplinary Review Board on January 21, 1981. The motion was denied, conditioned upon a further audit to insure that respondent's books and records were being properly maintained. Respondent failed to comply with the terms of the audit. Upon application by the District IX Ethics Committee, a custodial receiver for respondent's law practice was appointed on May 14, 1981. Respondent then consented to his temporary suspension from the practice of law.

The Gillis matter was heard before a panel of the District IX Ethics Committee on March 21, 1985. The panel heard testimony from respondent as to the difficulties which he had had in maintaining the office and clerical elements of his law practice (as opposed to his actual trial practice) after his law partnership broke up. Respondent described the depression he suffered and the subsequent neglect of his practice, which bottomed out when his wife threatened suit for divorce, his home was being foreclosed, and the Internal Revenue Service levied upon his trust account for payment of personal income taxes. Respondent testified that he then underwent intensive psychiatric treatment, was reconciled with his wife and ten children, and began a successful title business.

At the conclusion of the hearing, the panel determined that there were no trust account violations, but that respondent had not been diligent in prosecuting the Gillis matter. The panel determined that a private reprimand would be sufficient.

## CONCLUSIONS AND RECOMMENDATIONS

Upon review of the full record, the Board is satisfied that the conclusions of the District Ethics Committee in finding respondent guilty of unethical conduct are fully supported by clear and convincing evidence.

From the mid 1970's until his consent to temporary suspension in May 1981, respondent neglected numerous legal matters to the detriment of his clients. The Board agrees with the district committees that respondent was guilty of neglect and failure to pursue the matters diligently. *See Matter of Wallace,* 104 *N.J.* 589, 593 (1986); *Matter of Schwartz,* 99 *N.J.* 510, 518 (1985); *In re Haft,* 98 *N.J.* 1, 6 (1984). When retained he owed his clients a duty to pursue their interests diligently. *See In re Goldstaub,* 90 *N.J.* 1, 5 (1982); *Matter of Schwartz,* 99 *N.J.* 510, 518 (1985); *Matter of Smith,* 101 *N.J.* 568, 571 (1986). The record clearly indicates that, with the exception of some initial activity, respondent disregarded his obligations to his clients. When taken together, these instances establish a pattern of neglect, in violation of *DR* 6–101(A)(2).

Respondent repeatedly misrepresented the status of the case to his client Mrs. Marks. Once he learned of the dismissal of the cause of action against the doctors, he failed to advise his client and totally ignored her numerous requests for information. An attorney's failure to communicate with his clients diminishes the confidence the public should have in members of the Bar. *In re Stein,* 97 *N.J.* 550, 563 (1984). "[C]lients should not continue to suffer the consequences of being told their case was under control when it was not." *In re Goldstein,* 97 *N.J.* 545, 549 (1984). Unfortunately, this is what occurred in more than one instance.

Respondent was also exceedingly negligent, indeed cavalier, in his approach to his recordkeeping responsibilities. This resulted in substantial inconvenience to the Garveys and necessitated a suit by a court reporter. Respondent's failure to

maintain adequate books and records violated *R.* 1:21-6 and thereby *DR* 9-102.

Nevertheless, the purpose of disciplinary action is not punishment of the attorney but protection of the public. *Matter of Goldstein,* 97 *N.J.* 545, 548 (1984); *In re Infinito,* 94 *N.J.* 50, 57 (1983). Hence, the Board has considered factors in mitigation. *In re Hughes,* 90 *N.J.* 32, 36 (1982).

During the time frame of the incidents, respondent was undergoing serious personal mental problems for which he ultimately sought psychiatric treatment with good results. These problems impacted not only upon his professional, but also upon personal and family life. Respondent's wife contemplated divorce. He faced foreclosure on his home and the disruption of the lives of his ten children.

Respondent has now turned his life around. He is reconciled with his family, regained financial stability and has achieved success in a new career as branch manager of a title company.

Moreover, the conduct in question occurred seven to twelve years ago. The committee hearings in these matters stretched from 1980 through 1985. Final resolution of discipline was further delayed by another complaint which was ultimately resolved in respondent's favor. The public interest in proper and swift discipline has been irretrievably diluted. *In re Verdiramo,* 96 *N.J.* 183, 187 (1984).

The Board concludes respondent has genuinely rehabilitated himself. With this evidence of his basic good character, respondent is unlikely to engage in actions similar to these again. *In re Sears,* 71 *N.J.* 175, 200 (1976). The Board feels that respondent's ethical infractions are neither intractable nor irremediable. *In re Templeton,* 99 *N.J.* 365, 376 (1985). Most importantly, whereas respondent's shoddy recordkeeping resulted in checks being dishonored, he did not knowingly misappropriate client funds. *In re Wilson,* 81 *N.J.* 451 (1979). Such mitigation "is relevant and should be considered." *Matter of Barbour,* 109 *N.J.* 143 (1988).

Consequently, the Board unanimously concludes that respondent's temporary suspension from the practice of law since June of 1981 be deemed sufficient discipline for all ethical infractions involved herein.

The Board further recommends Respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.